The judgment and the order denying defendant's motion for a new trial are reversed.

Peters, P. J., and Schottky, J. pro tem., concurred.

[Crim. No. 2384.   First Dist., Div. One.   May 20, 1946.]

THE PEOPLE, Respondent, v. MARY FRANCES NAVARRO, Appellant.

546

James F. Boccardo for Appellant.

Robert W. Kenny, Attorney General, David K. Lener and Alberta Gattone, Deputies Attorney General, Leonard R. Avilla, District Attorney, and A. A. Andreuccetti and Vernon E. Perren, Assistants District Attorney, for Respondent.

WARD, J.—The defendant, Mary Navarro, appeals from a judgment of conviction of second degree murder and the order denying her motion for new trial. The charge was based upon the death of one Sarah Castrillo as the result of an abortion allegedly performed by defendant. The court denied probation and committed defendant to the California Institution for Women.

Three points are raised on appeal: (1) Sufficiency of the evidence to support the verdict, including error by the trial court in denying the motion for a new trial; (2) incorrect instructions on circumstantial evidence; and (3) improper procedure in denying defendant's application for probation.

The facts appear as follows: On the third day of February, 1945, Sarah Castrillo, now deceased, the mother of three children, was pregnant. A few weeks prior to that date she had told her sister, Rita Soto, that she was going to get rid of the baby—that she was "going over to Mary's." Rita Soto

testified, without objection, that she understood her to mean the defendant Mary Navarro. Over the objection of appellant she also testified she told her she was going to pay about fifty or seventy-five dollars. The husband of deceased testified that his wife was in good health and that on the morning of February 3, 1945, she stated that she was going to get rid of the baby; that she was going over to Mary Navarro's. Sarah Castrillo left the home of her sister, Rita Soto, about 6:30 of the evening of February 3d. She arrived at the home of Mary Navarro approximately at 7:15. About 8:30 that evening Mary Navarro called Rita Soto on the telephone and said: "Things don't look so well, I think I will go and look for Raymond," the husband of the deceased. At approximately 9 o'clock p.m. Sarah Castrillo talked to her husband "through the phone." About fifteen or twenty minutes after that phone conversation Mary Navarro came after Raymond Castrillo. She arrived in a Pontiac with another couple and told the husband that his wife had fainted. They rode back to Mary Navarro's place where they found Sarah Castrillo lying on the bed. Raymond Castrillo testified: "Well, she looked to me like she was dead already." At ten o'clock p.m. Sarah Castrillo was picked up by an ambulance at Mary Navarro's place and taken to a hospital. William Freeman, the ambulance driver, testified that he found her at the home of Mary Navarro lying on the bed fully dressed, and "I believe she was still alive."

An expert pathologist and bacteriologist, Dr. Duval, called on behalf of the People, testified that he performed an autopsy upon the body of Sarah Castrillo; that the autopsy disclosed a pregnant womb or uterus in which an abortion had been attempted. He testified that the placenta had been torn from its attachment to the inner lining of the womb and that the womb was torn and lacerated in many places. Dr. Duval further testified that in his opinion severe hemorrhage followed immediately upon the attempted abortion and that the patient probably became comatose in a very few minutes from lack of blood. The doctor further testified that in his opinion it would have been impossible after the bleeding occurred for the patient to have moved herself from one place to another.

In answer to a question whether the deceased could have performed the abortion on herself, the witness stated: "I can't answer that very——I can't answer it put in that way, except to say that it is hardly likely that she could have herself, with

an instrument, torn that placenta away from its moorings and lacerated it, because of the pain, for one thing, and the tremendous loss of blood before the placenta was disturbed to the extent we find it here, or I find it here, she would have been exsanguinated and couldn't very well have finished the job as finished as this is." There is some conflict in the record in reference to a girdle found stuffed between mattresses in the Navarro home. The prosecution claimed it was the girdle of the deceased. Appellant's husband said that it was his girdle. There is also conflicting testimony concerning the identity of persons in the car which the appellant occupied on her trip downtown to find decedent's husband. The county pathologist testified to certain facts and conclusions in conflict with the testimony of the autopsy surgeon, particularly in reference to the absence of blood on the clothing of the decedent and around the vagina.

■ Appellant submits that all that the record shows is that decedent was pregnant; that she said she was going to get rid of the baby and that she was going over to Mary's. Appellant suggests that the evidence shows only opportunity to commit rather than an attempt to commit an abortion, and that if a reasonable inference could be drawn that an abortion or an attempt had been committed, it could have been committed by her step father-in-law or two neighbors who came to appellant's home, or by some other person before she returned to her home, or it might have been performed by the decedent herself. The father-in-law of appellant testified that when decedent was in the Navarro home no one was present except the witness and appellant. Appellant testified that up to the time decedent became ill the father-in-law was resting in the living room. *During part of that time appellant and decedent were alone in another room.* The husband testified that shortly after he arrived appellant "was running around, repeating 'What shall I do? What shall I do?'" Whether the autopsy surgeon's or the city pathologist's testimony should be accepted was a question for the jury. The witness for the defense testified that it is not necessary, even if the abortion is accidental, that blood should "be emitted through the vagina," but that "the hemorrhage is dissolved in the uterus," and that sometimes "in the case of such loosening of the rectal placenta hemorrhage there would be then no external loss of blood." Therefore it appears that there is ample evidence, if believed, to sustain the verdict against defendant. More than mere opportunity was proved.

The basic legal problem briefed in determining the sufficiency of the evidence in this case, which was based wholly on circumstantial evidence, is the applicability of the statement that "the circumstances proved must not only be wholly consistent with the defendant's guilt, but they must also be inconsistent with any other rational conclusion." The appellant cites no cases in support of the view that the appellate court will apply this rule to reverse a conviction. The rule that the establishment of guilt on circumstantial evidence alone, which evidence seemingly is equally compatible with innocence, should result in a verdict for the accused is not the test on appeal. Where the jury reaches a conclusion of guilt, and there is evidence to support the verdict, an appellate court is bound by the implied finding of the jury as reflected in the verdict. (*People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631]; *People* v. *Bradley,* 71 Cal.App.2d 114 [162 P.2d 38]; *People* v. *Harshaw,* 71 Cal.App.2d 146 [161 P.2d 978].) In *People* v. *Newland,* 15 Cal.2d 678, 680 [104 P.2d 778], a conflict in the California cases is noted and the rule above noted is said to be applicable only as an instruction to the jury in the first instance concerning reasonable doubt, that only where there is no evidence to warrant the jury's inference of guilt will a conviction on circumstantial evidence be reversed. The record before this court shows that there was ample evidence, if believed to sustain the verdict.

It is claimed, however, that the court erred in the refusal of two instructions on the subject of circumstantial evidence reading as follows: "When circumstantial evidence is relied upon to establish the guilt of the defendant, each material fact or circumstance necessary to complete the chain or series of independent facts tending to establish the guilt must be established by the prosecution to the same degree of certainty as the main fact which these independent circumstances taken together tend to establish; that is, essential and independent fact in the chain or series of facts relied upon to establish the main fact must be established to a moral certainty and beyond a reasonable doubt, and if you should then have a reasonable doubt upon any single essential fact relied upon to complete the chain of circumstances, you can not convict the defendant so long as you entertain such doubt."

"The guilt of the defendant must be established by substantial and competent evidence. Mere suspicion, however strong, that the defendant committed a crime is not sufficient

to warrant a verdict of conviction. If the proof on the part of the prosecution consists solely of circumstantial evidence and such circumstantial evidence may reasonably lead to two conclusions, one being a conclusion of innocence and the other being a conclusion of guilt, the jury is bound to adopt the conclusion which leads to innocence and must not adopt that which leads to guilt. In order for a defendant to be convicted on purely circumstantial evidence must tend to establish the guilt of the defendant and must be entirely inconsistent with any theory of innocence. If the circumstantial evidence is equally consistent with the theory of innocence and one of guilt, you must acquit the defendant.''

■ When the evidence is wholly circumstantial the defendant in a criminal case is entitled to an instruction on the necessity of establishing each essential fact beyond a reasonable doubt, and that the circumstances must be consistent with the guilt of the defendant and inconsistent with any other rational conclusion. (*People* v. *Hatchett,* 63 Cal.App.2d 114 [146 P.2d 469]; *People* v. *McClain,* 115 Cal.App. 505 [1 P.2d 1085]; *People* v. *Rayol,* 65 Cal.App.2d 462 [150 P.2d 812].) Words of equal import may be substituted if the principle is substantially but clearly and fairly set forth. (*People* v. *Green,* 13 Cal.2d 37-44 [87 P.2d 821]; *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8].) Seldom used verbiage and legal phrases may not be understood or they may be misinterpreted by the ordinary juror. ■ Simple language is preferable. The instruction need not be repeated. An argumentative form should not be adopted. ■ If the instruction is certain as applied to the facts of the case, intelligible and free from doubt, it is sufficient. ■ If the instructions taken as a whole are as favorable to the accused as the issues of fact and law justify, the refusal of other instructions covering the same subject matter is not error. ■ Here the court instructed: ''The law has laid down a cardinal rule to govern all criminal cases, and the outstanding principle of the administration of criminal law in this country is that a defendant is presumed to be innocent, and that presumption is with him when the case begins; it follows him all through the trial; it abides with him even into the jury-room after you have retired, and is still with him up until the time when, if at all, he is found to be guilty. That is a species of evidence and is to be taken by you and kept in your mind at all times, that the making of a charge against the defendant is no proof, and has no weight,

as to his guilt or innocence; that the presumption of innocence stays with the defendant at all times. He is presumed to be innocent until the contrary is proven and proven beyond a reasonable doubt and to a moral certainty. . . . And I am reading to you now Section 1096 of the Penal Code of the State, and it reads as follows: 'A defendant in a criminal action is presumed to be innocent until the contrary is proved and in case of a reasonable doubt, whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.' . . . Circumstantial evidence is evidence of circumstances from which the inference of the fact is drawn, properly, reasonably, logically. Circumstantial evidence is governed by the same rules that direct evidence is, and, in the eyes of the law, is regarded as just as reliable as direct evidence. So that there should be no hesitancy either on the part of a jury in acting upon circumstantial evidence where it is convincing and where it is such as to convince them beyond a reasonable doubt and to a moral certainty of the fact which it is intended to prove. . . . *If you have any reasonable doubt, as I have defined it to you, in your minds, of any fact or circumstance necessary to prove this offense, then the defendant is entitled to be acquitted. The proof necessary to be made in order to establish the commission of this crime must be, not only consistent with the guilt of the defendant, but it must be inconsistent with any other reasonable conclusion. And the jury, in order to find a verdict of guilty must find that the circumstances are such that they are consistent with the guilt of the defendant of the offense charged, and inconsistent with any other reasonable conclusion."* (Emphasis added.)

The emphasized portion of the instructions, in conjunction with the others, should have left the jurors in no uncertain frame of mind relative to circumstantial evidence. The jury was fully and fairly informed in plain and simple language on the rules and principles applicable to circumstantial evi-

552

dence. " 'When the court fully and fairly charges the jury upon the law appertaining to the facts of the case, its failure to instruct on any particular matter deemed essential is not error in the absence of a request for such an instruction.' (8 Cal.Jur. 309, and cases cited.)'' (*People* v. *Warren,* 16 Cal.2d 103, 117 [104 P.2d 1024] ; see, also, *People* v. *Melone,* 71 Cal.App.2d 291 [162 P.2d 505].) The Warren case is often cited. Recently it was referred to in *People* v. *Bender, supra.* In the Bender case the court's attention was called to the language used in *People* v. *Hatchett, supra,* and, on the facts of the Bender case, the court held that, in view of the constitutional provisions (art. VI, § 4½), it was sufficient in stating a principle to use the language in substance. Here the principle of law omitted in the Bender case and the Hatchett case was stated in unequivocal language and the second instruction, given in both the cited cases and relied on to cure the omission, was given in substance.

It is also urged that the procedure provided by law was not followed by the trial court on appellant's application for probation. Section 1203 of the Penal Code provides that ''After the conviction by plea or verdict of guilty of a public offense in cases where discretion is conferred on the court . . . as to the extent of the punishment the court, upon application of the defendant or of the people or upon its own motion, may summarily deny probation, or at a time fixed may hear and determine in the presence of the defendant the matter of probation of the defendant and the conditions of such probation, if granted; if probation is not denied, the court must immediately refer the matter to the probation officer to investigate and to report to the court at a specified time, upon the circumstances surrounding the crime and concerning the defendant and his prior record, which may be taken into consideration either in aggravation or mitigation of punishment; . . . further provided, however, that probation shall not be granted to any defendant who . . . at the time of the perpetration of said crime . . . of which he was convicted inflicted great bodily injury or torture. . . .'' By this section the court in its discretion may summarily deny probation. In this connection it might be noted that in *People* v. *Darrow,* 212 Cal. 167 [298 P. 1], it was held that whether great bodily injury within the meaning of the code section is present in an abortion is a question of fact for the trial judge. (See, also, *People* v. *Harshaw,* 71 Cal.App.2d 146 [161 P.2d 978].) It

does not appear that the trial judge abused his discretion in this respect. Whether the evidence of bodily injury in this case is sufficient to bring this case within the latter quoted provision of section 1203 as a case in which probation could not be granted, need not be determined.

In closing his remarks at the time the court ruled on the motion for a new trial the following appears: "Regardless of what I might do if I were trying a case without a jury, I couldn't grant a new trial in the face of the evidence, that is in a verdict of that jury. The motion for a new trial will be denied." The statement is not definite whether the court was referring to a trial, without a jury, of any case or of this case and so it is necessary to look to other statements of the court (*People* v. *Megladdery*, 40 Cal.App.2d 748, 772 [106 P.2d 84]) to determine whether the trial court used his discretion, independently of the conclusions of the jury. The following statements appear in the record: "THE COURT: The motion for a new trial must be considered by the Court when it is made upon a question of evidence in the light of the power of the jury to determine the credibility of the witnesses and the weight to be given the testimony. With that power exercised by the jury, the Court has no right to interfere except in a case where it is obviously exercised without any basis at all. In other words, I am bound on a motion for a new trial, to accept the judgment of the jury as to which witnesses they believed, and I am bound to accept the judgment of the jury as to the weight to be given the evidence. If there is no evidence, or the evidence is so slight it becomes a matter of law, then I can interfere with the jury's verdict, but not otherwise. . . . If I was sitting as a Court in the trial of facts, I would listen to the two doctors and decide for myself which doctor's testimony I would believe. The jury has that power. It was tried before a jury, the jury evidently didn't believe Dr. Proescher, and did believe Dr. Duval,—and so with the other evidence,—and if there was sufficient evidence which they believed, regardless of conflicting evidence or contrary evidence, if you can pick out enough evidence which it believed, would indicate the guilt of the defendant, beyond a reasonable doubt, then there is not anything we can do about it. . . . And in this case there is [the evidence]. If the jury believed and were convinced, it convinces their minds, and apparently they did, I have no power to grant a new trial under those conditions, unless I am convinced myself there

554

was sufficient evidence to create a legal situation which would justify me in setting the verdict aside.''

On a motion for a new trial from a verdict of a jury the losing litigant is entitled to a decision by the trial judge on the sufficiency of the evidence, giving due weight to conflicts and inconsistencies in the evidence and the credibility of the testimony of witnesses. The court must use its own determinative discretion as distinguished from the conclusions reached by the jury. ''It has frequently been observed that a defendant in any action which is tried before a jury is entitled to two decisions on the evidence, one by the jury and the other by the trial judge in ruling upon a motion for a new trial (*Smith* v. *Royer*, 181 Cal. 165 [183 P. 660] ; *People* v. *Bacos*, 14 Cal.App.2d 338, 349 [58 P.2d 221] ), that the court in the latter instance in passing upon the sufficiency of the evidence is not bound by conflicts in it (*Moyer* v. *Dresch*, 2 Cal.App.2d 655 [38 P.2d 849] ), and that, where the evidence is conflicting, such features as credibility and the manner and appearance of witnesses in testifying, and the proper weight to be accorded to evidence must be given consideration. (*People* v. *Bacos*, *supra*.) The responsibility resting upon a trial judge when a motion for a new trial is presented again to review a cause and only after such review to decide the motion and the duty imposed upon the court to grant the motion if such review produces a conviction of evidentiary nonsupport of the jury's verdict are matters which have also been emphasized.'' (*People* v. *Mattmueller*, 25 Cal.App.2d 418, 420 [77 P.2d 504].) ''Nevertheless, it is settled that, in any trial which is had with the assistance of a jury, a defendant is entitled to two decisions on the evidence, one by the jury and another by the trial judge in passing upon a motion for a new trial. (*Smith* v. *Royer*, 181 Cal. 165 [183 P. 660].)'' (*People* v. *Cesena*, 18 Cal.App. 2d 727, 729 [64 P.2d 732].) ''An appellate court cannot order a new trial on the ground of insufficiency of the evidence if there is any substantial evidence by which the verdict can be supported. (*People* v. *McClennegen*, 195 Cal. 445, 449-450 [234 P. 91] ; *People* v. *Schafer*, 198 Cal. 717, 721 [247 P. 576].) But a trial court can grant a motion for new trial where the evidence is legally sufficient and even where the only evidence is that of the prosecution. [Citing cases.] As previously indicated the evidence in this case amply supports the verdict but that fact cannot justify us in sustaining a judgment pronounced after a denial of any essential element of a

fair trial or of due process of law.'' (*People* v. *Sarazzawski*, 27 Cal.2d 7, 16 [161 P.2d 934].)

From the above statements of the trial court and the established rules with respect to the trial court's powers on motion for new trial, it is evident that the defendant did not receive the independent conclusion of the trial judge on the merits of the evidence. It is necessary therefore that the case be returned to the trial court even though as a matter of law the evidence was sufficient to sustain the verdict.

The order denying the motion for a new trial and the judgment of sentence thereafter pronounced are vacated and set aside with directions to the trial court to again hear and determine the motion for a new trial in accordance with the legal rules hereinabove stated. If the trial court determines that a new trial should be granted the cause will be set at large and the appellant will be entitled to a trial on the merits, but if the trial court shall determine that the new trial should be denied then the trial court shall again pronounce judgment of sentence upon the defendant as provided in sections 1168, 1191, 1192a, 1193, 1200, 1202, 1207, 1213, 1214, 1215. The time limits provided for in those sections are to run from the filing of the remittitur in the superior court.

Peters, P. J., and Knight, J., concurred.

[Civ. No. 15149. Second Dist., Div. Three. May 20, 1946.]

MERICIA GONZALEZ DE HARLAN, Respondent v. WARREN E. HARLAN, Appellant.

Button, Herzog & Butts for Appellant.

A. J. O'Connor and George J. Hider for Respondent.

SHINN, J.—Plaintiff is the daughter-in-law of defendant, Warren E. Harlan, being the wife of his son Richard. Plaintiff and defendant own as joint tenants a residential property in Beverly Hills. The lot was purchased by defendant and the house was built in 1937, principally with the money of defendant, his contribution, including the amount of a loan on the property, being some $15,000, although plaintiff and her husband contributed the sum of $7,100, which was needed to complete the house. The property was placed in joint tenancy by deed of February 15, 1938, by defendant, as grantor, to himself and plaintiff, as grantees, and on the same day an agreement was entered into by plaintiff and defendant, reading as folows:

"This Agreement made and executed at Los Angeles, California, this 15th day of February, 1938, by and between Warren E. Harlan, hereinafter designated as First Party, and Mericia Gonzalez de Harlan, hereinafter designated as Second Party, both of the City and County of Los Angeles, State of California; Witnesseth: Whereas, First Party is a widower at present about 67 years of age and is the owner of and resides at No. 1136 North Doheney Drive, in said city and county of Los Angeles, state aforesaid, in a two-story stucco, Spanish type residence dwelling which he has recently constructed and completed, which premises are more particularly described as folows: [Description.] Whereas, Said Second Party is the daughter-in-law of said First Party and, together with her husband, Richard Harlan, the son of First Party, resides with said First Party in said home aforesaid; and Whereas, said Richard Harlan is the only child of said First Party; and Whereas, the said parties, together with said Richard Harlan, son of said First Party and the husband of said Second Party, have resided together for a number of years; and Whereas, by reason of such association between the parties there has arisen and now exists mutual feelings of full faith, trust and confidence; and Whereas, said First Party is the owner of said house and desires to convey the same to said Second Party and himself as joint tenants for the joint and equal use, enjoyment, and advantage of said Second Party and said Richard Harlan, her husband aforesaid, and himself, reserving to himself, however, certain exclusive rights, privileges and options as more fully hereinafter set out; and Whereas, said First Party is further will-

ing to convey said property to Second° Party and himself jointly, as joint tenants, with the provision that if he, said First Party, should decease, in that event said Second Party shall use, enjoy and otherwise hold said property for the joint and equal benefit of herself and her husband, Richard Harlan, the son of said First Party, with the right in said Second Party on the death of said First Party to sell or otherwise dispose of said property if she shall see fit and thereupon apportion the proceeds of the sale thereof equally between herself and said Richard Harlan; and Whereas, said Second Party is agreeable to the same; Now, Therefore, in consideration of the mutual promises and covenants of the parties hereto one to the other, as hereinafter set forth, it is hereby mutually agreed as folows: 1. That First Party does this day by Grant Deed in Joint Tenancy transfer and convey the said real estate and home hereinbefore described and referred to, to himself and said Second Party as joint tenants, with sole right of survivorship, subject only to: current taxes and assessments, if any; restrictions and rights of way; and a Trust Deed encumbrance in favor of Home-Builders' Loan Association of Pomona, California, in the approximate principal sum of $1500.00. 2. That during the lifetime of said First Party he shall have the exclusive right and privilege of selling, mortgaging, renting, encumbering, or in any other manner disposing of said real estate, and said Second Party agrees to execute any and all documents which may be necessary or required in the exercise of any of First Party's rights and privileges herein granted. 3. Upon the death of First Party and consequent vesting of the title to said real estate in said Second Party as sole survivor, said Second Party shall have the sole and exclusive right and authority to sell, assign, transfer, encumber, mortgage, rent, hypothecate, or otherwise deal with said property, without any let or hindrance by any person, provided, however, that, upon the sale, transfer, or other disposition of said property by Second Party, she shall thereupon divide any proceeds thereof, after the payment of any necessary expenses incurred by reason thereof, equally between herself and her husband, Richard Harlan, son of First Party. During the lifetime of First Party he shall at all times have the right to occupy said home, together with Second Party, and use and enjoy same jointly with said Second Party. 5. The parties hereto by this agreement do